FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

AUG 0 4 2016

SEAN F. McAVOY, CLERK
_____DEPUTY
SPOKANE, WASHINGTON

*AUSA Assigned: CAB*

*Spokane County*

*Affidavit in Support of Criminal Complaint as to Darryl Carillo.*

## AFFIDAVIT

STATE OF WASHINGTON )

                            )     :ss

County of Spokane      )

I, Adam Julius, being first duly sworn on oath, deposes and states:

### PURPOSE OF THIS AFFIDAVIT

1.    This affidavit is submitted in support of a criminal complaint against Darryl W. CARILLIO.

### AGENT BACKGROUND

2.    Your affiant has been employed by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") as a Special Agent since March of 2014. Prior to your affiant's employment with the ATF, your affiant served in the United States Army National Guard as a Fire Support Specialist which included just under two years of active duty service. Thereafter, your affiant attended Eastern Washington

Affidavit of Adam Julius- 1

University and received a Bachelor of Arts degree in Criminal Justice. After graduating from Eastern Washington University, your affiant became a Seattle Police Officer and worked in that capacity from June of 2007 until March of 2014.

3.      In March of 2014, your affiant attended the Federal Law Enforcement Training Center, Criminal Investigator Training Program, and successfully graduated in June of 2014. Your affiant also attended the ATF Special Agent Basic Training and successfully graduated in September of 2014. These courses of study totaled 26 weeks of law enforcement training. In addition, your affiant attended the Washington State Basic Law Enforcement Academy, which was approximately 4.5 months long, the Seattle Police Department Field Training Program, the Seattle Police Detective school, the Seattle Police Anti-Crime Team school, and the Seattle Police Undercover school.

4.      As an ATF Special Agent, and a Seattle Police Officer, your affiant has participated in the execution of numerous state and Federal search warrants. These warrants included searches for evidence related to the illegal possession of controlled substances and the illegal possession of firearms.

Affidavit of Adam Julius- 2

## 1st controlled purchase from CARILLIO

5.      Your affiant has personal knowledge that on July 7, 2016, an undercover

ATF agent ("UC1") made contact with Richelle BOUCHARD ("BOUCHARD")

using the Facebook messenger application.  Through a series of Facebook

messages, BOUCHARD told UC1 that she could arrange for the purchase of drugs

and firearms on July 13, 2016 through a friend of hers.  BOUCHARD told UC1

that the firearms were potentially stolen and she sent a photograph of multiple

firearms that were for sale.  That photograph corresponded with the firearms that

UC1 would ultimately purchase from Darryl CARILLIO, with the exception of the

Walther pistol not being in the photo (discussed below).  The deal was arranged to

occur at approximately 4:00 PM, at the end of the driveway at 11416 E Bigelow

Gulch Road, Spokane, WA.

6.      On July 13, 2016, UC1, and a second undercover ATF agent (UC2) engaged

in a controlled firearm purchase operation.  UC1 drove the undercover vehicle

while UC2 sat in the passenger seat.  UC1 wore an audio/video recorder during the

controlled purchase, which was secreted on his person.  UC2 wore an audio

recorder, which was secreted on her person.  Both devices functioned during the

entirety of the operation.  The UCs also utilized an ATF vehicle with audio/video

Affidavit of Adam Julius- 3

recording capabilities during the operation. For unknown technical reasons, the

vehicle recording did not record for the entirety of the operation. The recording

ended at approximately 5:08PM. Your affiant reviewed the audio/video recordings

before writing this affidavit.

7.    UC1 and UC2 drove to CARILLIO's house located at 11416 East

Bigelow Gulch Road, Spokane, Washington as previously arranged with

BOUCHARD. At approximately 4:29PM, UC1 and UC2 arrived at the end

of the driveway, near the road, at that address. BOUCHARD was waiting for

the UCs and advised them that CARILLIO went back to his house.

CARILLIO's shops and house are located at the end of a long driveway,

estimated to be about ¼ mile in length. BOUCHARD told the UCs to wait

for her and CARILLIO to return.

8.    At about 4:34PM, CARILLIO and BOUCHARD rode back to the UC

vehicle, from the house, with CARILLIO driving an all-terrain vehicle

(ATV). CARILLIO told UC1 that he had the guns in his house, sitting on his

bed and asked the UCs to return to the house with him. UC1 told CARILLIO

that he wasn't comfortable going in the house so they compromised and

agreed to meet at the halfway point of the driveway. CARILLIO stated he

Affidavit of Adam Julius- 4

had a .22 handgun, a .243 hunting rifle, and a 7.62mm German machine gun. UC1 said "it's not a real machinegun." CARILLIO stated "yeah, real machinegun, I got, show you the numbers and look it up online." UC1 asked if it was registered and CARILLIO replied "no, it's not registered or nothin', it's an old world war gun." CARILLIO said "it's a full on machinegun." UC1 asked CARILLIO what the price was for the machinegun. CARILLIO said he didn't know what it was worth. UC1 told CARILLIO that if it wasn't registered it was not worth a lot of money because if you got caught with it you would be in big trouble. UC1 said he was still interested in the machinegun because he had people he could sell it to.

9.      CARILLIO said the machinegun was used in wars up until 2011 but he thought it was made in the 1960's. UC1 told CARILLIO that he was thinking it would be worth a couple hundred bucks. CARILLIO said he thought it was worth more than that. UC1 asked CARILLIO to bring it back and they could look at it. CARILLIO said that he had a 20 gauge shotgun, a .22 handgun and, a machinegun to sell. CARILLIO rode his ATV back to his house in order to retrieve the firearms. UC1 observed CARILLIO enter an area near a large shop, on the west side of the property, which UC1 believed

Affidavit of Adam Julius- 5

to be where CARILLIO was staying. UC1 drove the UC vehicle to the halfway point of the driveway. UC1, UC2 and BOUCHARD waited for CARILLIO at that location.

10.    At approximately 4:42PM, CARILLIO arrived at the UC vehicle riding his ATV with multiple firearms strapped to the ATV. CARILLIO told UC1 that he had two firearms in his belt. CARILLIO removed a Walther P-22 pistol and a black powder revolver from his waistband. UC1 offered CARILLIO $100.00 for the Walther pistol, which also included a magazine loaded with ammunition. The Walther pistol had an obliterated serial number. CARILLIO stated that the numbers had been scratched off of the Walther pistol so he believed it was stolen. CARILLIO stated that as far as he knew, the other firearms were not stolen. CARILLIO said he had acquired the firearms "over the years." UC1 did not offer to purchase the black powder revolver.

11.    UC1 examined a shotgun which CARILLIO stated was a .20 gauge shotgun (later determined to be a Browning 20 gauge shotgun bearing serial number 80657). UC1 offered $100.00 for the shotgun and CARILLIO declined. CARILLIO showed UC1 a shotgun which had the barrel and stock

Affidavit of Adam Julius- 6

sawed off in a crude fashion. CARILLIO said the shotgun was originally

made that way. CARILLIO stated the shotgun came like that and it was

actually legal if it came from the factory like that (the shotgun was of pistol

length). CARILLIO said he wanted $150.00 for the sawed off shotgun (later

determined to be a Richmond Arms Company shotgun, bearing serial number

9320). CARILLIO showed UC1 another shotgun and stated he wanted

$150.00 for that firearm (later determined to be a Diamond Arms Company

12 gauge shotgun without a serial number).

12.    UC1 examined the machinegun, which was very large and looked like

a crew serve weapon of military grade to UC1. UC1 offered $200.00 for the

machinegun. CARILLIO countered with $300.00 for the machinegun. UC1

and CARILLIO ultimately agreed to a price of $750.00 for all of the firearms,

except the black powder revolver.

13.    UC1 asked CARILLIO if he could get ½ ounce of methamphetamine.

CARILLIO agreed to that, but was waiting for his source of controlled

substances to arrive. BOUCHARD mentioned that Josh (ATKINSON) had

been selling ounces of methamphetamine to the UCs for $550.00 per ounce.

UC1 counted out $750.00 in pre-recorded ATF agent cashier funds (US

Affidavit of Adam Julius- 7

currency) and handed it to CARILLIO. UC1 and UC2 loaded all of the purchased firearms into the trunk of the UC vehicle.

14.    CARILLIO said they would have to wait for his drug dealer. CARILLIO rode back to his house and returned a short time later. CARILLIO made a phone call to his drug dealer and said he was finishing up a deal then would be over. UC1 and UC2 departed the CARILLIO residence in order to get sodas for everyone. UC1 used that opportunity to advise surveillance of the current status of the deal. UC1 and UC2 returned with sodas and gave them to CARILLIO and BOUCHARD.

15.    While waiting for CARILLIO's drug dealer to arrive, the UCs talked to BOUCHARD (CARILLIO arrived after BOUCHARD). BOUCHARD mentioned that the drug dealer's name was "John" and he drove a white convertible car. BOUCHARD told the UCs that CARILLIO had additional firearms in his house. UC1 told BOUCHARD that if CARILLIO had ½ ounce of methamphetamine on him, he would just purchase it directly from CARILLIO. BOUCHARD returned to the house to talk to CARILLIO.

Affidavit of Adam Julius- 8

16.    At about 5:41PM, BOUCHARD returned to the UCs who were still parked in the driveway.  BOUCHARD expressed frustration with the drug dealer not being on time.  BOUCHARD told the UCs that she was getting a connection fee from CARILLIO for the firearm purchase and she was allowed to stay at the house rent free.  CARILLIO arrived and the UCs continued to make small talk with CARILLIO and BOUCHARD while they waited for CARILLIO's drug dealer to arrive.  UC1 received CARILLIO's phone number, (509) 251-3132, and they agreed to complete the methamphetamine purchase and additional firearms purchases in the future. UC1 and UC2 departed the residence at about 5:55PM.  Throughout the operation, CARILLIO inferred that the property, 11416 East Bigelow Gulch Road, Spokane, WA, was his property, and his shop.

17.    Immediately upon completion of the controlled purchase, UC1and UC2 turned off the audio/video recorders and the audio recorder.  UC1 maintained custody of the purchased firearms and transported them to the ATF office where custody was transferred to ATF Firearm Interstate Nexus Expert Quintanilla for processing.  Your affiant has discussed the firearms with SA Quintanilla and

Affidavit of Adam Julius- 9

determined that the firearms travelled in interstate and/or foreign commerce. The firearms purchased were:

    a) Degtyarev Pakhontnyi (DP) machinegun, 7.62x54 mm, with an obliterated serial number.

    b) Browning, model Auto Five, 20 gauge shotgun bearing serial number 80657.

    c) Diamond Arms Company, 12 gauge shotgun without a serial number.

    d) Walther, model P-22, .22 LR caliber pistol with an obliterated serial number. This firearm came with a magazine loaded with 8 rounds of .22 LR caliber CCI ammunition.

    e) Richmond Arms Company, double barrel 12 gauge shotgun bearing serial number 9320. This firearm has been modified to an overall length of under 21 inches and a barrel length of just over 13 inches.

18.    SA Helm conducted a National Crime Information Center (NCIC) check of the firearms and determined that one of the firearms was reported as stolen. The Browning 20 gauge shotgun was listed as stolen out of Helena, Montana. Your affiant requested and received a copy of the Helena Police report related to that

Affidavit of Adam Julius- 10

stolen firearm.  The firearms with obliterated serial numbers could not be checked as of this affidavit.

## 2nd controlled purchase

19.     Your affiant has personal knowledge that on July 14, 2016, UC1 and UC2 acted in an undercover capacity during a controlled methamphetamine purchase operation.  Prior to the controlled purchase, at approximately 2:58PM, UC1 made a recorded phone call to CARILLIO, at phone number 509-251-3132.  CARILLIO agreed to meet UC1 at the Safeway located in the Hillyard neighborhood.  UC1 offered $700 for an ounce and a half of methamphetamine, CARILLIO replied "I'll see what I can do."

20.     UC1 wore an audio recorder during the controlled purchase, which was secreted on his person, and UC2 wore an audio/video recorder, which was secreted on her person.  Both devices functioned during the entirety of the operation.  The UCs also utilized an ATF vehicle with audio/video recording capabilities during the operation.  SA Helm reviewed the audio/video recording before writing a summary which your affiant used to write this affidavit.

Affidavit of Adam Julius- 11

21.     UC1 and UC2 drove to the Safeway located at 3919 North Market Street in Spokane, Washington.  At approximately 4:14PM, UC1 called CARILLIO, at phone number 509-251-3132.  CARILLIO confirmed he would meet UC1 at the Safeway in approximately 15 minutes.  UC1 later received a text from CARILLIO which said he would be driving a silver Dodge.  At approximately 4:31PM, ATF agents conducting surveillance, to include SA Smith observed CARILLIO arrive in the Safeway parking lot in a silver Dodge Ram pickup, bearing Washington license plate number C92471E.  CARILLIO parked next to UC1 and UC2 and subsequently got into the passenger seat of the ATF undercover vehicle holding a gold colored statue with a wooden box on the bottom.  UC1 asked CARILLIO: "one and a half?" (indicating an ounce and a half of methamphetamine).  CARILLIO responded "yeah, one and a half."  CARILLIO agreed to "7" and UC1 gave CARILLIO $700 in pre-recorded ATF funds.  UC2 removed the wooden box and discovered suspected methamphetamine, heat-sealed in clear plastic, contained within the gold colored statue.  CARILLIO told the UCs he had a bag sealer and "I try to do it right."

Affidavit of Adam Julius- 12

22.    UC1 conversed with CARILLIO about future gun purchases. UC1 asked if CARILLIO had a magazine or drum for the Russian machinegun that UC1 purchased from CARILLIO the day prior. CARILLIO stated he did not shoot the Russian machinegun. He stated he received the machinegun three or four months ago and it had been sitting in his safe. CARILLIO told UC1 that he maybe broke even or made $50 selling the gun to UC1.

23.    CARILLIO told UC1 he could get two or three ounces of methamphetamine with a few days or a week's notice. CARILLIO said he needed time to come up with the money and that every dime he has is invested in his home and shop. Before departing, CARILLIO stated he would look for additional guns for UC1 and that he was looking for a legit (believed to mean not stolen) AR (assault rifle) to have around. At approximately 4:37PM, CARILLIO exited the vehicle and UC1 and UC2 departed from the Safeway parking lot.

24.    Immediately upon completion of the controlled purchase, UC1 and UC2 turned off the audio/video recorders and the audio recorder. UC2 maintained custody of the purchased methamphetamine. UC1 and UC2 processed the purchased methamphetamine, which weighed approximately 47.4 gross grams and field tested positive for the presence of amphetamine.

Affidavit of Adam Julius- 13

25.    Washington Department of Licensing (DOL) records indicate Washington license plate number C92471E is assigned to a 2001 silver Dodge Ram pickup which is registered to Darryl W. CARILLIO at 11416 East Bigelow Gulch Road in Spokane, Washington.

### 3rd controlled purchase

26.    Your affiant has personal knowledge that between July 16 and July 20, 2016, UC1 and CARILLIO exchanged a series of text messages related to the purchase of methamphetamine and firearms.  CARILLIO indicated to UC1 that he was in the process of acquiring three ounces of methamphetamine in order to sell to UC1.  CARILLIO also indicated that he had picked up a firearm to sell to UC1. CARILLIO asked if he could describe them to UC1.  UC1 made a recorded phone call in order to get the description of the firearms.

27.    On July 19, 2016, at about 5:21PM, UC1 made a recorded phone call to CARILLIO at (509) 251-3132.  CARILLIO told UC1 that he was working on compiling the [methamphetamine] order.  UC1 had texted CARILLIO and requested three [ounces of methamphetamine].  CARILLIO told UC1 that he had ½ of the order ready, which indicated that he had 1.5 ounces of methamphetamine

Affidavit of Adam Julius- 14

available to sell to UC1.  CARILLIO said he believed he could get the other 1.5

ounces by 7/20/16, in order to sell them to UC1.  CARILLIO and UC1 agreed to

meet on 7/20/16 at about 1:00PM.

28.     Your affiant has personal knowledge that on July 20, 2016, at about

11:43AM, UC1 made a recorded phone call to CARILLIO at (509) 251-3132.

CARILLIO told UC1 that he could pick up a Glock .40 caliber pistol, a Smith &

Wesson, .38 caliber revolver, and a seven shot .32 or .22 caliber firearm from an

unknown individual for $150.00 per firearm.  CARILLO did not know if the

firearms were stolen or not.  UC1 told CARILLIO that he would pay $400.00 for

the firearms and give CARILLIO $100.00 for setting up the purchase.  CARILLIO

and UC1 agreed to meet at 2:00PM to complete the deal.  CARILLIO told UC1

that he did not have "the working capital" to purchase the three ounces of

methamphetamine and the drugs would not be allowed to leave his property.  For

that reason, CARILLIO requested that the deal occur at his house, 11416 E

Bigelow Gulch Road, Spokane, WA.  UC1 agreed to meet CARILLIO at that

location.

Affidavit of Adam Julius- 15

29.     On July 20, 2016, UC1 and UC2 engaged in a controlled firearm and drug purchase operation.  UC1 drove the undercover vehicle while UC2 sat in the passenger seat.  UC2 wore an audio/video recorder during the controlled purchase, which was secreted on her person.  UC1 wore an audio recorder, which was secreted on his person.  The UCs also utilized an ATF vehicle with audio/video recording capabilities during the operation.  All of the recording devices functioned during the entirety of the operation.

30.     UC1 made a phone call to CARILLIO which was barely audible on the audio/video recorder.  CARILLIO told UC1 that he had not acquired the firearms from his friend and only had half [of the three ounce order of methamphetamine] ready.  CARILLIO said he had a shotgun to sell UC1. UC1 told CARILLIO that he would come over shortly and purchase what CARILLIO had.

31.     UC1 and UC2 drove to CARILLIO's house located at 11416 East Bigelow Gulch Road, Spokane, Washington.  At approximately 2:22PM, UC1 and UC2 arrived at the end of the driveway, near the house, at that address, and parked next to a large shop structure which CARILLIO appeared

Affidavit of Adam Julius- 16

to be using as a residence. UC1 and UC2 noticed at least six vehicles at the residence to include CARILLIO's Dodge truck, license plate #C92471E.

32.    UC1 called CARILLIO and let him know that they had arrived at his residence. While waiting for CARILLIO, UC1 and UC2 noted multiple individuals at the residence. There were an estimated 3-4 individuals that were observed in a motorhome type recreational vehicle (RV). A black male from that RV entered a Dodge Dakota truck parked next to the UCs. An older white male walked from the RV and into the large shop type structure. The shop appeared to have two levels with the bottom level possibly being a garage work area and the top level possibly being a living area. Standing outside of the shop were a white female estimated to be 20 years of age and a white male in his mid-twenties. After a short period of time, CARILLIO exited the shop from the garage work area and approached UC1 who was sitting in the driver's seat of the UC vehicle. CARILLIO told UC1 that the gun was still in the house. UC1 told CARILLIO that he didn't want to go inside. CARILLIO went back to the house to retrieve the gun and methamphetamine, entering through the shop door.

Affidavit of Adam Julius- 17

33.   At about 2:35PM, CARILLIO returned to the UC vehicle and UC1 exited

his vehicle. (UC2 stayed in the UC vehicle).  CARILLIO was carrying a black

guitar case and he had a plastic baggie with a clear/white substance which UC1

believed to be about an ounce of methamphetamine in his hand.  UC1 and

CARILLIO walked back to the UC vehicle trunk.  CARILLIO told UC1 that the

methamphetamine weighed "28.4" [grams] and set it in the UC vehicle trunk.

CARILLIO said he wanted $500.00 for the methamphetamine.  UC1 opened the

guitar case and retrieved a bolt action shotgun from the guitar case.  CARILLIO

said the firearm was "supposedly clean."  UC1 offered $600.00 for the

methamphetamine and the firearm and CARILLIO accepted that price.  UC1

retrieved $600.00 in pre-recorded Drug Enforcement Administration (DEA) funds

(US currency) and handed that money to CARILLIO.  UC1 grabbed the

methamphetamine, left the gun in the trunk, and re-entered the UC vehicle.

CARILLIO and the UCs said goodbye and the UCs drove away from the

CARILLIO residence.  UC1 handed the methamphetamine to UC2 who maintained

custody of the drugs in her purse.

Affidavit of Adam Julius- 18

34.    Immediately upon completion of the controlled purchase, UC1 and UC2 turned off the audio/video recorders and the audio recorder.  UC1 maintained custody of the purchased firearm and transported it to the ATF office where custody was transferred to ATF Firearm Interstate Nexus Expert Quintanilla for processing.  Your affiant discussed the firearm with SA Quintanilla and determined that the firearm travelled in interstate and/or foreign commerce.  SA Quintanilla told your affiant that the shotgun was a High Standard, model 583.14, 16 gauge shotgun, no serial number, with an overall length of about 35 inches and a barrel length of 14 and 5/8 inches, qualifying it as a short barrel shotgun.  The barrel had been sawed off in a crude fashion.

35.    UC2 maintained custody of the purchased methamphetamine.  Your affiant and SA Helm processed the purchased methamphetamine, which weighed approximately 29.3 gross grams and field tested presumptive positive using NARK #NAR10015 drug test kit, for the presence of methamphetamine.

### NFA Search

36.    Your affiant caused a search to be made of the National Firearms Registration and Transfer Record (NFRTR) for any firearms registered to

Affidavit of Adam Julius- 19

CARILLIO.  The search indicated that CARILLIO does not have any registered firearms.

### Darryl CARILLIO

37.    Your affiant received certified copies of the judgment and sentences for CARILLIO's two felony convictions out of the Superior Court of Washington, Snohomish County.  Your affiant examined the two felony judgment and sentences and they appeared to qualify as felony convictions under Federal law.  Your affiant did not find any evidence that CARILLIO had his firearms rights restored.  The two felony convictions were: 1) 2nd Theft, Snohomish County Superior Court, filed 4/21/1998. 2) Residential Burglary, Snohomish County Superior Court, Juvenile Division, filed 5/12/1994.

\\

\\

\\

\\

\\

\\

\\

Affidavit of Adam Julius- 20

## CONCLUSION

38.    Based on the aforementioned information, your affiant respectfully submits there is probable cause to believe Darryl Carillio has committed the crimes of Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1), and Distribution of Methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C). As this affidavit is being submitted for the limited purpose of establishing probable cause for this criminal complaint, has not included all the facts and circumstances surrounding this investigation.

Respectfully submitted,

Adam Julius, Special Agent
ATF

SUBSCRIBED AND SWORN to before me this _____ day of August, 2016.

John Rodgers
United States Magistrate Judge

Affidavit of Adam Julius- 21